IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JESSE WASHINGTON,

        Plaintiff,                    No. CIV S-04-1317 MCE GGH P

     vs.

J. FANNON, et al.,

        Defendants.            <u>FINDINGS & RECOMMENDATIONS</u>

_____/

        Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on the original complaint filed July 9, 2004. On December 1, 2004, defendants filed a motion to dismiss for failure to exhaust administrative remedies and for failure to state a claim. On August 2, 2005, the court granted in part and denied in part this motion. The following claims remain: 1) on June 30, 2003, defendant Kissinger used excessive force; 2) on July 1, 2003, defendant DeForest confiscated plaintiff's orthotic inserts and shoes; defendant Lynn refused to help in retrieving these items; 3) defendant DeForest denied plaintiff's request for accommodations so that he could participate in Ramadan; 4) on January 20, 2004, defendants Epperson and Ratliff refused to retrieve plaintiff's orthotic inserts, shoes, ibuprofen and cotton blanket; 5) on August 25, 2003, defendants Kissinger, Hibbits and Jackson used excessive force.

1

Pending before the court is defendants' motion for summary judgment filed September 1, 2006. On February 20, 2007, plaintiff filed an opposition. On March 12, 2007, defendants filed a reply. After carefully considering the record, the court recommends that defendants' motion be granted in part and denied in part.

Summary Judgment Standards Under Rule 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See

1  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356
2  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may
3  not rely upon the allegations or denials of its pleadings but is required to tender evidence of
4  specific facts in the form of affidavits, and/or admissible discovery material, in support of its
5  contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,
6  106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is
7  material, i.e., a fact that might affect the outcome of the suit under the governing law, see
8  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.
9  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the
10 dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the
11 nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

12         In the endeavor to establish the existence of a factual dispute, the opposing party
13 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the
14 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
15 versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary
16 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a
17 genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.
18 56(e) advisory committee's note on 1963 amendments).

19         In resolving the summary judgment motion, the court examines the pleadings,
20 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if
21 any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,
22 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the
23 court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.
24 at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's
25 obligation to produce a factual predicate from which the inference may be drawn.  See Richards
26 v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

(9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

On August 30, 2004, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

III. Discussion

    A. Failure to Exhaust Administrative Remedies

Defendants argue that the remaining claims should be dismissed for plaintiff's failure to exhaust administrative remedies. As discussed above, the court has already considered and denied a motion to dismiss on grounds that these claims are not administratively exhausted. The law of the case doctrine precludes the court from reexamining this issue. Hydrick v. Hunter, 466 F.3d 676, 587 (9th Cir. 2006) (quoting Richardson v. United States, 841 F.2d 993, 996 (9th Cir. 1988) ("Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case). For this reason, defendants' motion for summary judgment on grounds that plaintiff failed to exhaust administrative remedies should be denied.

    B. Excessive Force

    *Legal Standard*

When a prison officials stands accused of using excessive physical force in violation of the cruel and unusual punishment clause of the Eighth Amendment, the question turns on whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the purpose of causing harm. Hudson v. McMillian, 503 U.S. 1, 7, 112 S. Ct. 995 (1992). In determining whether the use of force as wanton and unnecessary, it

4

is proper to consider factors such as the need for application of force, the relationship between the need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of the forceful response. Hudson, 503 U.S. at 7, 112 S. Ct. 995.

The extent of a prisoner's injury is also a factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation. Id., 112 S. Ct. 995. Although the absence of serious injury is relevant to the Eighth Amendment inquiry, it is not determinative. Id., 112. S. Ct. 995. That is, use of excessive force against a prisoner may constitute cruel and unusual punishment even though the prisoner does not suffer serious injury. Id., 112 S. Ct. 995. However, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 7, 112 S. Ct. 995. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from the constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 9-10, 112 S. Ct. 995; see also Oliver v. Keller, 289 F.3d 623, 628 (9th Cir. 2002) (Eighth Amendment excessive force standard examines de minimis uses of force, not de minimis injuries).

*Defendant Kissinger*

Defendants argue that summary judgment should be granted to defendant Kissinger based on qualified immunity. Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established constitutional or statutory rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1987). In analyzing whether a particular official is entitled to qualified immunity, the court addresses two questions. First, the court considers whether the facts alleged show that the officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2155 (2001). Second, and only if a constitutional right was violated, the court considers whether the right was clearly established such that a reasonable officer would

believe that the alleged conduct was unlawful.  Id. at 202, 121 S. Ct. at 2156.  "The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987).

The following facts regarding this claim are undisputed.  On June 30, 2003, defendant Kissinger approached plaintiff's cell and asked him if he wished to shower.  After plaintiff stated that he wanted to shower, defendant Kissinger ordered plaintiff to back up to "cuff up," which means placing his arms through the cuff port in the door and having mechanical devices applied.  Plaintiff placed his arms through the cuff port.  What happened next is disputed.

According to defendant Kissinger, he cuffed plaintiff's left hand at which point plaintiff pulled away and went further into his cell.  Defendants' Exhibit R, ¶ 9.  Defendant then ordered the control tower officer to open the cell door.  Id., ¶ 10.  At this time, plaintiff took a couple of steps into the cell, looked back and said, "I got you this time."  Id.  At this point, plaintiff went to his knees, laid down on the ground and yelled, "Officer Kissinger pushed me to the ground, man down!"  Id.  During this entire time, defendant Kissinger remained at the door approximately six feet from plaintiff.  Id.

According to plaintiff, defendant Kissinger placed the mechanical restraints on both of his wrists.  Plaintiff's declaration filed in support of opposition, ¶ 9.  Plaintiff claims that defendant Kissinger then ordered the control door officer to open the cell door.  Id., ¶ 10.  When the door was partially open, defendant Kissinger then "violently pulled" plaintiff's arms and body into the edge of the door.  Id.  Plaintiff's lower back and right side of his hips area hit the steel door.  Id.

The undisputed evidence offered by defendants demonstrates that plaintiff had no medically verifiable injury following the incident.  The only injury plaintiff claims to have suffered is the pain he felt at the time of the alleged excessive force.  The court will summarize the undisputed evidence regarding plaintiff's medical examination following the incident.

The nurse who was summoned to plaintiff's cell following the incident states that she placed plaintiff on a backboard. Defendants' Exhibit S, ¶ 5. Plaintiff was then taken to the prison emergency room. Id. During the ride over, plaintiff told the nurse that after being cuffed up defendant pushed him and he fell forward causing severe lower back pain and right hip pain. Id. The nurse could find no injuries on plaintiff. Id.

The emergency room admission form prepared by Dr. Rohlfing states that plaintiff told him that defendant Kissinger pulled him through the door when it was opening causing injuries to his back. Id., attachment 2. Dr. Rohlfing wrote that plaintiff had good sensation, circulation and movement in all extremities. Id. He also wrote that plaintiff had no bruising or discoloration on his back, thighs, buttocks, hips, face, shoulders or arms. Id. He prescribed Ibuprofen for plaintiff. Id. Dr. Rohlfing also wrote that at one point, plaintiff was moaning, "give me something for this pain" and "get on that phone and tell that Dr. to give me a cane." Id. Defendant Rohlfing observed laughing and having an animated conversation with correctional officers. Id. Dr. Rohlfing also wrote that plaintiff became easily agitated and angry when anyone did not agree with him. Id. Plaintiff disputes these particular observations by defendants Rohlfing.

Plaintiff's conduct in the emergency room and his lack of a medically verifiable injury undermine his claim against defendant Kissinger. However, it is conceivable that defendant Kissinger could have slammed plaintiff against the cell door and left no mark on plaintiff's body. It is conceivable, but doubtful, that the force used, if any, was significantly in excess of deminimis. Therefore, the court finds that defendant Kissinger is not entitled to summary judgment on grounds that he did not violate the Eighth Amendment.

Having determined that defendant Kissinger is not entitled to summary judgment on grounds that he did not violate the Eighth Amendment, the court turns to the second prong of the qualified immunity analysis: whether the law was clearly established such that a reasonable officer would understand that what they were doing violated that right.

1  Plaintiff claims that defendant Kissinger violently slammed him into his cell door,
2 while he was handcuffed, for no apparent reason.  If true, the law regarding excessive force is
3 sufficiently clearly established so that no reasonable officer would believe that engaging in this
4 alleged conduct was lawful.  Accordingly, defendant Kissinger is not entitled to qualified
5 immunity.

6  *Defendants Kissinger, Hibbits and Jackson*

7  Plaintiff alleges that on August 25, 2003, defendants Kissinger, Hibbits and
8 Jackson used excessive force against him.

9  It is undisputed that on August 25, 2003, plaintiff's cell was searched.  What
10 happened beyond that is disputed.

11  In his declaration, defendant Hibbits describes defendants' version of what
12 happened:

> 7. During the course of the [cell] searching, which involved approximately sixty-four cells and one-hundred to one-hundred fifteen inmates, each inmate's mattress was removed, taken to R & R and examined with an X-ray, to ensure then [sic] did not contain contraband, including weapons.
>
> 8. Each mattress was marked for identification so it could be returned to the inmate's cell.  The search procedure began around breakfast time and ran into the afternoon.
>
> 9. After the cells had been searched and staff were returning to the mattresses, I removed Washington from his cell and placed him in handcuffs with a handcuff retention device which is basically a metal triangle which prevents the cuffs from going into the cell.  If the inmate pulls back once one hand is released, then he is inside his cell and we cannot enter without additional assistance.  The device was created because inmates oftentimes like to play games once handcuffs are placed onto the inmate simply moving inward into the cell and taking the handcuffs hostage.  The device prevents the inmates from having handcuffs applied and then simply pulling away into the cell.
>
> 10. The handcuffs and retention device were applied without any problem.  Washington was removed from his cell and escorted to the right exterior wall–about thirty feet from the cell.  I do not recall any comments from Washington at this point.  In fact, there were no complaints from Washington when Officer Jackson applied the handcuffs. This is surprising because Washington complains about everything.

26 /////

8

11. When Washington's mattress was returned, he refused to allow it in his cell, saying something to the effect that it was defective. He told me he would simply "sleep on the steel."

12. When it was reported what Washington had said about sleeping on steel, Lt. Wright ordered Jackson and me to nevertheless give Washington a mattress. I tried several times to have Washington take his mattress, but he refused.

13. Officer Kissinger was nearby, but only observed and did not participate whatsoever. After talking to Washington for some time, he finally agreed to take the mattress, believing it was a different mattress than what he originally had. Once he realized that the mattress was the same one, he became upset.

14. When placing Washington back into his cell, he became upset. While he did not complain about the handcuffs before the return to his cell, about half way back he began to resist. He tugged moderately, but did not exert a great deal of force. Once inside his cell Washington complained briefly that he could not get his hands through the food port even though he had just done it a short while earlier. He made references to his shoulder and back problems.

15. To assist him, I guided his hand out of the food port. I held inmate Washington's hands while Jackson removed the handcuffs. Washington made no complaints of pain or difficulty while the handcuffs were being unlocked. He made no request for medical care.

16. I did not use excessive force, nor act to injure Washington. No one in my presence used excessive force, nor acted to injure Washington. I took no action that exposed Washington to a known risk of harm.

In contrast, plaintiff alleges that defendant Jackson came to his cell and told plaintiff to submit to mechanical restraints so that he could be removed from his cell during the search. Plaintiff's declaration, ¶ 28. Plaintiff complied and was taken to a holding cage where the restraints were removed. Id., ¶ 29. At the end of the search, defendants Hibbits, Jackson and Kissinger came to the holding cage and reapplied the restraints, including a security-triangle device. Id., ¶ 32.

After plaintiff complained about the removal of his mattress during the search, defendants became hostile toward plaintiff. Id., ¶ 34. Defendants then used excessive force when they removed the security triangle device, causing pain to plaintiff's shoulders, arms and lower back. Id., ¶ 34. Plaintiff alleges that defendants violently pulled and twisted his arms and wrists. Id., ¶ 35.

In support of this claim, plaintiff refers to the declaration of inmate Turner attached to his opposition as exhibit 8. Inmate Turner states, in relevant part, that on August 25, 2003, he heard plaintiff screaming in pain as defendants removed the triangle restraints.

The court recommends that defendants be denied summary judgment as to this claim because of the disputed material facts. Plaintiff's version of the facts suggests that the force used in removing the security triangle device was not applied in a good faith effort to maintain discipline, but was applied for the purpose of causing harm. Defendants argue that they should be granted summary judgment because the level of force used was, at most de minimis. However, if the amount of force used caused plaintiff to scream out in pain, the court cannot find that the amount of force used was de minimis. Defendants also argue that they should be granted summary judgment because plaintiff suffered no medically verifiable injury. Plaintiff's claim that he suffered great physical pain as a result of their conduct is sufficient injury for this claim.

Having determined that defendants are not entitled to summary judgment on the merits of plaintiff's Eighth Amendment claim, the court turns to the second prong of the qualified immunity analysis: whether the law was clearly established such that a reasonable officer would understand that what they are doing violates that right.

Plaintiff claims that defendants violently pulled and twisted his arms for no reason other than to cause him pain while removing the security triangle device. The law regarding excessive force is sufficiently clearly established so that no reasonable officer would believe that engaging in this alleged conduct was lawful. Accordingly, defendants are not entitled to qualified immunity.

C. Inadequate Medical Care

*Legal Standard*

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.

285, 292 (1976). To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989). McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference." Of course, negligence is insufficient. Farmer, 511 U.S. at 835, 114 S. Ct. at 1978. However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient. Id. at 836-37, 114 S. Ct. at 1979. Neither is it sufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk. Id. at 842, 114 S. Ct. at 1981.

It is nothing less than recklessness in the criminal sense – subjective standard – disregard of a risk of harm of which the actor is actually aware. Id. at 838-842, 114 S. Ct. at 1979-1981. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S. Ct. at 1979. Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847, 114 S. Ct. at 1984. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842, 114 S. Ct. at 1981. If the risk was obvious, the trier of fact may infer that a defendant knew of the risk. Id. at 840-42, 114 S. Ct. at 1981. However, obviousness per se will not impart knowledge as a matter of law.

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation. Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

Moreover, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Id.

Additionally, mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm. McGuckin, 974 F.2d at 1060, citing Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-1000. A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the inquiry. McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992). In summary, "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant." McGuckin, 974 F.2d at 1061.

Superimposed on these Eighth Amendment standards is the fact that in cases involving complex medical issues where plaintiff contests the type of treatment he received,

expert opinion will almost always be necessary to establish the necessary level of deliberate indifference. Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988). Thus, although there may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the treatment he received equated with deliberate indifference thereby creating a material issue of fact, summary judgment should be entered for defendants. The dispositive question on this summary judgment motion is ultimately not what was the most appropriate course of treatment for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence, criminally reckless.

*Defendants DeForest and Lynn*

Defendants argue that they are entitled to qualified immunity.

The following facts regarding this claim are undisputed. On July 1, 2003, plaintiff was transferred to administrative segregation (ad seg). Upon plaintiff's arrival to ad seg, defendant DeForest confiscated his orthotic inserts and tennis shoes. Defendant Lynn, defendant DeForest's supervisor, upheld the decision to confiscate the inserts and shoes. At that time, plaintiff possessed a medical chrono authorizing him to possess the orthotic inserts and tennis shoes. At the time, inmates in ad seg were not allowed to have special shoes or devices like orthotic inserts in their cells pursuant to a HDSP policy. Pursuant to the policy, plaintiff was allowed to use his shoes and inserts when leaving his cell. Plaintiff had been prescribed the shoes and inserts because of a diagnosis of severe flat feet. At some later time, prior to April 6, 2004, a decision was made to allow plaintiff to possess the shoes and inserts in his cell. Defendants' Exhibit Z, attachment 3.

In order to show that defendants acted with deliberate indifference plaintiff must demonstrate that he faced a substantial risk of serious harm if he did not have access to his shoes and inserts while he was in his cell. In his declaration, defendants' medical expert, Dr. Greenough, states that plaintiff did not face a substantial risk of serious harm:

/////

1  |  From a medical perspective, if Washington were removed from his cell for any appreciable period of time (e.g. being moved for purposes of a medical or other appointment outside of the Administrative Segregation area requiring that he walk a significant distance), then I would conclude from his preexisting conditions, that it would have been best to have him use the inserts and, or, special shoes outside the cell.  However, while housed inside his cell where he would not be moving about, I do not conclude that his inserts and special shoes rose to a level of a medical necessity.  This is because the cells are quite small and do not accommodate moving around much at all.  Thus, based upon my education and training and expertise in podiatry, not having these devices while inside his cell did not expose him to a serious risk of medical harm.  In fact, I would not expect short-term absence of Washington's orthotics or his special shoes to have caused any immediate medial significant or worsening or his underlying foot conditions, even if he were required to move about for a very short period of time outside his cell.

Greenough declaration, defendants' exhibit T, pp. 12-13.

Plaintiff has offered no evidence demonstrating that he suffered a substantial risk of serious harm as a result of not having access to his shoes and inserts while in his cell.  In his declaration submitted in support of his opposition, plaintiff states that he told defendant Lynn that he suffered excruciating pain when he had to stand on the cement floor of the holding cage for one hour without his shoes and inserts.  Plaintiff does not claim that he was required to stand in his cell for one hour or otherwise suffered pain as a result of not having access to his shoes and orthotics while in his cell.  That plaintiff was later allowed to possess the shoes and orthotics in his cell does not undermine this finding.

For the reasons discussed above, the court recommends that defendants DeForest and Lynn be granted summary judgment as to this claim.  Because the court finds no Eighth Amendment violation, it need not analyze the remaining factors of the qualified immunity analysis.

*Defendants Ratliff and Epperson*

Defendants argue that they are entitled to qualified immunity.

It is undisputed that on January 20, 2004, plaintiff was moved to a different cell in ad seg.  It is also undisputed that both defendants Ratliff and Epperson were correctional sergeants at that time. The remaining facts regarding this claim are disputed.

14

In his declaration filed in support of his summary judgment motion, plaintiff alleges that on January 20, 2004, Counselor Norgaard interviewed him before the transfer. Plaintiff's declaration, p. 24. At the end of the interview, plaintiff claims that it was "reestablished" in front of defendants Ratliff and Epperson that plaintiff was allowed to have his tennis shoes and orthotic inserts.[1] Id. Defendants Ratliff and Epperson then took plaintiff to his new cell. Id. When they arrived at the new cell, plaintiff claims that he asked defendants retrieve his prescribed ibuprofen and his prescribed cotton blanket that had been left in his old cell. Id., pp. 24-25. Plaintiff alleges that this request was "ignored and denied" by defendants. Id., p. 25. Plaintiff also claims that defendants intentionally confiscated his inserts and tennis shoes. Id. Plaintiff claims that he repeatedly asked defendants to retrieve his ibuprofen, blanket, inserts and tennis shoes, but that these requests were ignored. Id., pp. 25-26.

At the outset, the court finds that for the reasons discussed above plaintiff has not demonstrated that he suffered a serious risk of harm were he not allowed to possess his shoes and inserts in his cell. Accordingly, defendants Ratliff and Epperson are entitled to summary judgment as to this claim. Because the court finds no Eighth Amendment violation, it need not analyze the remaining factors of the qualified immunity analysis.

Whether plaintiff asked defendants to retrieve his blanket and ibuprofen is disputed. Both defendants state that they do not recall asking plaintiff asking to have any items brought to him in his new cell. Defendants' Exhibit Z ¶ 11, AA ¶ 9.

\\\\\

---

[1] In his declaration, plaintiff also claims that the state-issued tennis shoes that he was allowed to wear when out of his cell were too tight. Id. Plaintiff argues that defendants would not allow him to possess his personal tennis shoes, which were size 9EEE. Id. Plaintiff's complaint filed July 9, 2004, contains no claim that the shoes plaintiff was allowed to wear when out of his cell while in ad seg were too tight. It appears that plaintiff is attempting to amend his complaint in response to the evidence presented in defendants' summary judgment motion. Plaintiff may not amend his complaint by way of his declaration submitted in support of his opposition. The only claim in the complaint is that plaintiff was not allowed to have tennis shoes in his cell. That is the only claim that will be addressed in these findings and recommendations.

1    Defendants also suggest that even if plaintiff had asked them to retrieve his
2 blanket and ibuprofen, it was not part of their duties.  As sergeants, defendants state that they
3 were not involved in the seizure or storage of inmate property.  Defendants' Exhibits Z ¶ 7, AA ¶
4 5.  Defendant Epperson states that he would not be responsible for transferring items to the other
5 building.  Defendants' Exhibit AA,¶ 5.  Rather, one of his officers or officers from the other unit
6 would be responsible for transferring the items.  Id.
7    If an inmate has a verifiable medical need for a medication, it is no defense to a
8 defendant's failure to obtain the medication that it was "not in my job description."  Accordingly,
9 defendants are not entitled to summary judgment on the basis that their job was merely to
10 transport plaintiff, but not his property.
11    It is hard to believe that an Eighth Amendment violation could be based on the
12 denial of ibuprofen and a cotton blanket, but this determination will have to be made by a jury for
13 the reasons discussed below.
14    Defendants do not dispute that plaintiff had a prescription for ibuprofen.
15 Defendants do not argue that plaintiff had no serious medical need for this prescription.  In fact,
16 defendants do not address what ailment the ibuprofen was treating.  Accordingly, the court finds
17 that defendants are not entitled to summary judgment as to the claim that they failed to retrieve
18 plaintiff's ibuprofen.
19    Defendants do not dispute that plaintiff had a chrono authorizing him to possess a
20 cotton blanket, presumably based on a wool allergy.  Defendants argue that plaintiff did not have
21 a serious medical need for the cotton blanket because their medical expert, Dr. Greenough, could
22 find no positive test results for a wool patch performed on plaintiff.  Defendants' Exhibit T,
23 Greenough declaration, 51.
24    Because plaintiff had a prescription for a cotton blanket, it is reasonable to infer
25 that another doctor determined that plaintiff had a wool allergy.  Without knowing the basis for
26 the other doctor's determination that plaintiff had a wool allergy, the court cannot find that

16

plaintiff had no medical need for the cotton blanket because Dr. Greenough could find no positive results for a wool patch performed on plaintiff. Accordingly, defendants are not entitled to summary judgment on grounds that plaintiff did not have a serious medical need for the cotton blanket.

Finally, defendants argue that they are entitled to summary judgment because any involvement they may have had in depriving him of his blanket and ibuprofen was negated when he took steps to acquire such items from other staff members. Defendants do not state that plaintiff acquired the items or when. Without this information, the court cannot determine whether defendants are entitled to summary judgment on this ground.

Accordingly, the court recommends that defendants Epperson and Ratliff be denied summary judgment as to plaintiff's claim that they violated the Eighth Amendment by refusing to obtain his ibuprofen and cotton blanket.

Having determined that defendants are not entitled to summary judgment on the merits of plaintiff's Eighth Amendment claim, the court turns to the second prong of the qualified immunity analysis: whether the law was clearly established such that a reasonable officer would understand that what they are doing violates that right. The Eighth Amendment law regarding medical care is sufficiently clearly established so that a reasonable officer would know that their failure to retrieve medically prescribed items for an inmate being transferred to a new cell could violate the Eighth Amendment. For this reason, defendants are not entitled to qualified immunity as to this claim.

### D.  Violation of Right to Practice Religion: Defendant DeForest

In the complaint, plaintiff alleges that Officers Husky and Fannon intentionally removed portions of food from his evening Ramadan food tray and omitted his replacement food portions. Complaint, p. 9. Plaintiff wrote a letter to the warden regarding the tampering with his food. Id., p. 10. On November 10, 2003, defendant DeForest interviewed plaintiff regarding the statements made in his letter. Id. At the conclusion of the interview, defendant DeForest denied

plaintiff's request to be moved to a different housing unit or to have his food trays delivered by officers other than Husky and Fannon. Id.

Because Officer Fannon continued to tamper with plaintiff's food tray, plaintiff filed an administrative appeal. Id., pp. 10-11. On November 30, 2003, defendant DeForest again interviewed plaintiff. Id., p. 11. Plaintiff again requested that he either be moved to a different housing unit or to have his food trays delivered by officers other than Husky and Fannon. Id. Defendant DeForest again denied this request. Id. Plaintiff was forced to discontinue with the Ramadan fast. Id.

Plaintiff alleges defendant DeForest violated his First Amendment right to practice his religion by failing to take steps to ensure that plaintiff could participate in the Ramadan fast. Id.,p. 8.[2]

To establish a free exercise clause claim, an inmate must demonstrate that correctional officers "burdened the practice of his religion, by preventing him from engaging in conduct mandated by his faith, without any justification reasonably related to legitimate penological interests." Freeman v. Arpaio, 125 F.3d 732, 736 (9th Cir. 1997).

It is undisputed that plaintiff is a practicing Muslim. It is also undisputed that Muslims must abstain from all food and drink during the daylight hours for the entire month of Ramahan. It is also undisputed that plaintiff withdrew from the Ramadan fast.

Defendants argue that they are entitled to summary judgment as to this claim on several grounds. Defendants argue that defendant DeForest looked into plaintiff's complaint that he was receiving insufficient food and that it was unfounded. Defendants' Exhibit X, p. 4. In investigating plaintiff's complaint, defendant DeForest concluded that plaintiff's primary concern was that he was upset about being housed in a safety needs building that may contain inmates

---

[2] At his deposition, plaintiff testified that Officers Husky and Fannon also spit in his food. This claim was not contained in his complaint, and plaintiff may not amend his complaint by way of deposition testimony.

that snitch. Id., p. 5. Defendant DeForest suspected that plaintiff was concerned that plaintiff would be labeled a snitch and wanted to be moved for this reason. Id.

In the complaint and declaration submitted in support of the opposition, plaintiff generally alleges that Officers Fannon and Husky removed portions of his food from his food tray. Plaintiff does not describe in detail the amount of food he received or the food that was actually removed. The only evidence in the record addressing this issue is a copy of a claim submitted by plaintiff to the State Board of Control regarding this matter. Opposition, Exhibit 9. In this claim, plaintiff states that on October 6, 2003, he informed Officers Husky and Fannon that he and inmate Franklin did not receive their coleslaw. Id. Inmate Franklin was given his cup of coleslaw, but plaintiff was not.[3] Id.

Were plaintiff to demonstrate that the amount of food removed from his food tray prevented him from being able to participate in the fast, the court would find that defendants were not entitled to summary judgment as to this claim. However, the only evidence presented by plaintiff regarding the amount of food removed from his food tray is that on one occasion he did not receive a cup of coleslaw. That plaintiff did not receive a cup of coleslaw on one occasion did not prevent him from participating in the Ramadan fast. Accordingly, the court recommends that defendant DeForest be granted summary judgment on this ground. Because the court recommends that defendant be granted summary judgment on this ground, it need not address the other grounds raised in defendants' motion.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants' September 1, 2006, summary judgment motion be denied as to the following claims: 1) on June 30, 2003, defendant Kissinger used excessive force; 2) on January

---

[3] In this claim to the Board of Control, plaintiff also claimed that the Ramadan food trays contained less food portions than were provided to other inmates. Id. Plaintiff's claim in the instant action is that defendant DeForest did nothing about his complaint that Officers Husky and Fannon were removing food from his tray and not giving him replacement portions. He does not claim that he told defendant DeForest that the portions were not enough. This is a different claim that will not be addressed in these findings and recommendations.

20, 2004, defendants Epperson and Ratliff refused to retrieve plaintiff's ibuprofen and cotton blanket; 3) on August 25, 2003, defendants Kissinger, Hibbits and Jackson used excessive force.

      2. Defendants' September 1, 2006, summary judgment motion be granted as to the following claims: 1) on July 1, 2003, defendant DeForest confiscated plaintiff's orthotic inserts and shoes; defendant Lynn refused to help in retrieving these items; 2) defendant DeForest denied plaintiff's request for accommodations so that he could participate in Ramadan; 3) on January 20, 2004, defendants Epperson and Ratliff refused to retrieve plaintiff's orthotic inserts and shoes.

      These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 6/13/07

                        /s/ Gregory G. Hollows

                        UNITED STATES MAGISTRATE JUDGE

wash1317.sj